[File No. 6642.]

SAM H. FULLER, Appellant, v. FRED FINGER et al., as Members of and Constituting the Board of County Commissioners of Stark County, North Dakota, Respondents.

(289 N. W. 805.)

Opinion filed January 8, 1940.

*C. F. Kelsch,* Assistant Attorney General, and *John E. Williams,* for appellant.

*T. F. Murtha,* for respondents.

Burr, J. Plaintiff applied to the district court for a writ of mandamus directed to the Board of County Commissioners of Stark county, ordering the Board to approve a salary and mileage voucher of the plaintiff for services rendered by him under contract of employment made with the County Welfare Board of Stark county as a case worker in Stark county, alleging the Board refuses to approve said voucher

and "to authorize the issuance of a county warrant drawn upon the Poor Relief or Social Welfare Fund of said county for the payment thereof."

The petition alleges:

"IV

"That the plaintiff pursuant to and in the performance of his contract of employment did perform all of the duties and render all of the services required of him to be performed and rendered by the Stark Welfare Board; and that by reason thereof he has duly earned and is now entitled to the sum of Forty Two and 50/100 ($42.50) Dollars for services rendered as part-time caseworker in accordance with his instructions so to do.

"V

"That the plaintiff, in the performance of the duties assigned to him had to travel one hundred seventy eight (178) miles in Stark county during the month of March in the performance of his official duties as such part-time caseworker; and that by reason of the mileage so actually traveled in the discharge of his official duties and his contract of employment, there is now due him the sum of Twelve and 46/100 ($12.46) Dollars for mileage for the month of March, 1939.

"VI

"That the plaintiff, upon the completion of the services so rendered as part-time caseworker duly prepared and presented to the Stark County Welfare Board for its consideration and approval:

"1. A salary voucher in the sum of One Hundred Forty Two and 46/100 ($42.46) [$142.46] Dollars; an expense or mileage voucher in the sum of Twelve and 46/100 ($12.46) Dollars; and that said County Welfare Board, while being duly assembled and acting in its official capacity did approve said salary and expense vouchers in the sums so presented in accordance with its contract of employment; and that said approval of said vouchers is duly evidenced by the signature of the Chairman of the said Board endorsed thereon; that the said County Welfare Board duly delivered both said salary and mileage voucher to the County Auditor of Stark county for the approval thereof by the Board of County Commissioners and its authorization of the issuance

of warrants drawn upon the County Poor Relief or Social Welfare Funds for the payment thereof.

"VII

"That the defendants while duly assembled and acting in their official capacity as the Board of County Commissioners of Stark county have at all times and still refuse to approve the salary and mileage vouchers of the plaintiff so presented and filed with said Board for payment, and have at all times refused and still refuse to authorize the issuance of a county warrant drawn upon the Poor Relief or Social Welfare Fund of said county for the payment thereof."

Answering the order to show cause, the defendants urge that the plaintiff is not entitled to any warrant on the theory that the County Welfare Board has no authority whatever to employ the plaintiff as a case worker at the expense of Stark county.

All the facts are stipulated and may be summarized as follows: A County Welfare Board for Stark county was duly organized "pursuant to the provisions of § 25 of chapter 97 of the Session Laws of 1933, as amended by chapter 123 of the Session Laws of 1935;" on the 7th of November, 1935, the Board of County Commissioners of Stark county and the Public Welfare Board of North Dakota signed a valid agreement between the Board of County Commissioners and the Public Welfare Board "with reference to the manner in which state funds contributed by the state of North Dakota and distributed by the Public Welfare Board of North Dakota to Stark county are to be expended;" prior to February 14, 1939, the plaintiff was employed by the County Welfare Board at a salary of $85 per month and mileage, and the county commissioners on that date directed he be discharged on the ground there were "too many investigators being employed by the Stark County Welfare Board . . . ;" the County Welfare Board ignored this order and employed the plaintiff as a part-time case worker for the compensation of $42.50 per month and expense at the rate of 7¢ ·per mile for all mileage necessarily traveled; on March 7, 1939, the county commissioners, by formal action, adopted a motion to the effect that plaintiff's "services as social investigator be dispensed with at the close of Feb. 14th;" and the plaintiff was advised at that time of this action of the Board of County Commissioners but continued as an employee

of the County Welfare Board. The plaintiff performed all of the services required, necessarily traveled the number of miles indicated by his voucher, and the voucher was audited and approved by the County Welfare Board and filed with the county auditor, who presented the voucher to the Board of County Commissioners for salary for the month of March, 1939, and for mileage. There is money in the Social Welfare Fund of Stark county out of which the voucher could be paid, but the Board of County Commissioners refuses to authorize the issuance of a county warrant "drawn upon the Poor Relief or Social Welfare Fund of said county."

The trial court determined the County Welfare Board of Stark county had no authority to employ the plaintiff as a case worker at the expense of Stark county; that the county commissioners have exclusive jurisdiction in all poor relief matters of the county, are the fiscal agents for the county, are the overseers of all the poor within the county, have complete and exclusive jurisdiction of the administration af all poor relief within the county; that the members of the County Welfare Board are not officials of the county, have no direct authority to employ any case worker and have no right to employ, discharge, or fix the salaries for any poor relief case workers by reason of any agreement entered into between the Public Welfare Board and Stark county. The court, therefore, denied the writ and the plaintiff appeals.

In 1933 the legislature enacted chapter 97 of the Session Laws, a comprehensive and sweeping statute dealing with county poor relief. The powers theretofore exercised by subdivisions and municipalities within the county were withdrawn and the county commissioners of the several counties became "the overseers of the poor within their respective districts." By § 3 of this act the county commissioners were given "exclusive jurisdiction and control of the administration of poor relief within each county, except as otherwise provided in this act." The exceptions stated in the act have no bearing upon this controversy. This act repealed practically all of the previous legislation of the state dealing with poor relief and centralized the work in the Board of County Commissioners.

Section 24 of this chapter 97 authorized the Board of County Commissioners to "employ an experienced social worker, or poor commissioner, who shall perform such duties respecting the administration of

the poor laws in such county or counties, as the board of county commissioners shall require under the supervision of such board or boards, and may fix his compensation and allow and pay his necessary expenses from the general funds of the county."

Section 25 of this chapter permitted the Board of County Commissioners to appoint a county welfare board to serve without pay. Upon such appointment it became "the duty of such county welfare board to aid and assist in every possible way to co-ordinate and bring about an efficient operation of all relief and welfare activities within their respective counties by private as well as public organizations engaged in welfare and relief work. It shall also be the duty of such welfare board to supervise and direct such relief and welfare activities as the county conducts. All acts of such board in the supervision or direction of welfare activities shall be subject to review by the board of county commissioners." Taking this chapter 97 of the Session Laws of 1933 in its entirety, taking into consideration the whole purpose of the statute and construing this § 25 to ascertain the powers of a county welfare board, it is clear this Board was organized to "aid and assist" the county commissioners in poor relief matters, "to co-ordinate and bring about an efficient operation of all relief and welfare activities . . . ," and whether the relief work is conducted by "an experienced social worker, or poor commissioner" or conducted under the supervision of the County Welfare Board, the Board merely supervised and directed the relief and welfare activities, which supervision or direction was "subject to review by the Board of County Commissioners." There is nothing in such statute which in any way gave the County Welfare Board the power to bind the county on its own volition. It is clear that, in order to exercise such authority, direct authorization would have to be given by the Board of County Commissioners under the powers given to this Board by the statute. It is important to note this feature because of certain statements made in the "contract" made with the State Public Welfare Board and hereinafter set forth.

Coincidental with the enactment of chapter 97, the legislature enacted chapter 98 of the Session Laws of 1933, known as the "County Poor Relief Fund" Act. The moneys in this fund consisted of "that proportion of the tax receipts which the county poor relief appropriation bears to the total county appropriations." Section 2. "All ex-

penditures for the relief of the poor shall be paid out of the County Poor Relief Fund. . . . ." The county treasurer is required to pay into the fund from the taxes received the proportion of each tax which the poor relief appropriation bears to the total county appropriations, and § 3 provides: "All expenditures for the relief of the poor shall be paid out of the County Poor Relief Fund, but said fund shall not be subject to any other charges. . . ."

Section 5 of chapter 98 provides: "In case the County Board of any county, due to an emergency, expends in any one year such an amount for poor relief purposes that the total county appropriations for that year are exceeded, the appropriations for the following year, to make up the deficit caused by such expenditures, shall not be included within the appropriations subject to the tax levy limitation for general county purposes now provided by law." It is clear this chapter 98 is supplementary to chapter 97, but even if the term "County Board of any county" includes the County Welfare Board which the Board of County Commissioners was authorized to establish, there is nothing therein which gave to the County Board any authority in itself to incur debts for the county in any other manner or form than authorized by chapter 97. The amendment to this chapter, as set forth in chapter 120 of the Session Laws of 1935, in no way adds to the power of the County Welfare Board. In fact, this chapter merely amends § 4 of said chapter 98 and provides for transfer of other county funds to this Poor Relief Fund, but only "on order of the Board of County Commissioners." The whole purpose of the legislation in 1933 was to vest all power in the Board of County Commissioners. The reference to poor relief, as found in chapter 282 of the Session Laws of 1935, recognizes this sole authority in the Board of County Commissioners, for it merely validates emergency warrants issued for poor relief in cases "where the Board of County Commissioners of any county shall have heretofore incurred any obligation or obligations on the part of the county in providing poor relief. . . ."

In 1935 the legislature of this state, by chapter 123 of the Session Laws, amended this § 25 of chapter 97 of the Session Laws of 1933 by making it compulsory upon the Board of County Commissioners to appoint a county welfare board "by and with the advice and consent of the Public Welfare Board of North Dakota." By this amendment

the legislature outlined the qualifications of the members of the County Welfare Board and the terms of office. This amendment provides: "It shall be the duty of such county welfare board to supervise and direct all relief and welfare activities conducted by the county; and, under the direction and supervision of the public welfare board of North Dakota, to supervise and administer such relief and welfare activities in the county as may be financed in whole or in part by or with funds allocated or distributed by the public welfare board of North Dakota. It shall also be the duty of such county welfare board to aid and assist in every possible way to co-ordinate and bring about an efficient operation of all relief and welfare activities within the county by private as well as public organizations engaged in relief and/or welfare work. . . ."

Examining this amendment and comparing it with the original section, the following changes will be noted:

1. It became compulsory on the part of the county commissioners to appoint a County Welfare Board;

2. This County Welfare Board, under the direction and supervision of the Public Welfare Board, was given the power to supervise and administer such relief and welfare activities in the county "as may be financed in whole or in part by or with funds allocated or distributed by the Public Welfare Board of North Dakota;" and

3. A member of the County Welfare Board could be removed without cause by resolution adopted jointly by the Board of County Commissioners and the State Board of Public Welfare, on the initiation of either body.

This amendment contains no specific authorization empowering the County Welfare Board as such board to make commitments chargeable against the County Poor Relief Fund.

It is still the duty "of such County Welfare Board to supervise and direct all relief and welfare activities" conducted by the county. The county has its "County Poor Relief Fund," which fund is under the direction and control of the Board of County Commissioners. When the county itself conducts relief and welfare activities, the Board of County Commissioners draws upon this fund, and whatever supervision and direction of the county relief work is done under the authority of the county commissioners is done under the supervision and direction

of the Board of County Commissioners, and so far as the work of the County Welfare Board is concerned, their power with reference to this fund is not enlarged. It will be noted that this expression, "It shall be the duty of such County Welfare Board to supervise and direct all relief and welfare activities conducted by the county," as found in chapter 123 of the Session Laws of 1935, is exactly the same expression as found in the original § 25 of chapter 97 of the Session Laws of 1933 which vested the control of relief work in the county commissioners.

Section 24 of chapter 97 of the Session Laws of 1933 was not specifically repealed, and, therefore, still stands, unless it is determined that the provisions of subsequent legislation were such as to repeal it by implication because of contradictory provisions which could not be reconciled, and none has been shown.

But the undisputed facts show further that the county withdrew this power and authority which it gave to the County Welfare Board. The county commissioners, as overseers of the poor, could of themselves make commitments on the part of the county, and could authorize the County Welfare Board to do it for them. This the County Commissioners of Stark county did do. But the power given was power which could be withdrawn, and which the county commissioners did withdraw. From that time on the County Welfare Board had no authority to make commitments against the "County Poor Relief Fund" so as to bind the county and could not employ the plaintiff and have his salary paid out of that fund.

What effect the withdrawal of this authority would have upon the relief work conducted under the direction of the State Public Welfare Board, and the allocation of state and Federal aid to Stark county, as hereinafter discussed, is not in issue in this case and need not be determined.

The "State Public Welfare Fund" is created by § 5 of chapter 221 of the Session Laws of 1935. This fund consisted of appropriations by the state legislature, and the act provided that: "Any funds received from Federal agencies shall be deposited and disbursed in the manner provided by act of Congress or by the regulations of the Federal agencies from whom the funds were received." This fund is to be disbursed "by the state treasurer upon warrants drawn by the state

auditor, such expenditure to be supported by itemized vouchers to be signed by the executive director of the Public Welfare Board or by such other officers . . . or assistants as the Board may designate. . . ."

The powers and duties of the Public Welfare Board are outlined in § 6 of chapter 221 of the Session Laws of 1935. This Board is made "the official agency of the state of North Dakota in any social welfare activity initiated by the Federal Government," and it is empowered "to administer, allocate and distribute any state and Federal funds that may be made available . . ." for relief, mother's aid, old age assistance, aid to dependent or crippled children, maternal and child health, child welfare, and public health service. The Board is empowered, and it is its duty, to make available to the several counties, municipalities, etc., funds supplied to the Board by the state and Federal governments, "To co-operate with and advise and assist the various county welfare boards in every way possible." This statute also provides that "The compensation of clerks, stenographers, and other necessary employees shall be determined by the Board." The State Board of Public Welfare is not given power to make commitments on the part of the county itself so as to bind the county to the payment thereof out of the "County Poor Relief Fund."

The Federal Congress from time to time enacted statutes providing for grants for the various states to enable the states to finance old age assistance, unemployment compensation, aid to dependent children, and numerous other social adventures.

Without going exhaustively into the administrative features of such legislation, it is sufficient to say that all allotments made to states required a state agency of some character to be established for the administration, the plan of the state agency being in harmony with and approved by the Federal authorities. Chapter 221 of the Session Laws of 1935, which created the State Board of Public Welfare, recognized the necessity for co-operation with the Federal Government and created the State Board for the purpose of qualifying the state to receive these grants. The "Plan" of the State Welfare Board agreed to by the Board of County Commissioners of Stark county and made a part of its agreement provided that "funds granted to counties by the Public

Welfare Board shall be deposited by the County Treasurer in a special fund which shall be designated 'Social Welfare Fund.'"

The allocation of such State Welfare Funds was made by "specific grants to the County Welfare Boards." The money is state money, derived either from state appropriations or from Federal grants. It is a state and Federal relief fund. It is not tax money raised by the county. The stipulation of facts shows that there was sufficient money in the "Social Welfare Fund of Stark county" to pay in full these vouchers involved.

On November 15, 1935, the Board of County Commissioners of Stark county entered into an agreement in writing with the Public Welfare Board of North Dakota, which agreement, among other statements, contains the following provisions:

"Par. 3. And whereas, it is necessary to co-ordinate the administration of relief and welfare activities in the county and centralize the authority for the administration of relief under the County Welfare Board in conformity with the provisions of chap. 97, Laws of 1935,

"Par. 4. And whereas, the County Welfare Board has no authority to incur any obligation on behalf of the county or to make commitments in the name of the county without authorization from the Board of County Commissioners

"Par. 5. And whereas, the Public Welfare Board of North Dakota has adopted as a fixed policy the allocation of state funds on the basis of relief or welfare need in each county after taking into consideration the financial ability of the county to provide for relief or welfare needs.

## "AGREEMENT

"Therefore: It is hereby mutually agreed by and between the Board of County Commissioners of Stark County, North Dakota, and the Public Welfare Board of North Dakota as follows:'

"1. The Board of County Commissioners of Stark County, North Dakota, agrees to authorize the County Welfare Board to make commitments in the name of the county and against the county funds to the extent necessary to take care of necessitous relief or welfare activities within the county or to the extent of the financial ability of the county to finance such activities in co-operation with the Public Welfare Board.

"2. Said Board further agrees to make this authorization for a specific and definite amount for each month.

"3. The Public Welfare Board of North Dakota agrees to make a monthly grant or allocation of State funds available for distribution, on the basis of the relief needs or welfare needs of the county after taking into consideration the relative financial ability or inability of each county to care for such needs.

"4. The 'State Plan,' adopted by the Public Welfare Board of North Dakota at a meeting on October 15th, 1936, is approved and made a part of this agreement.

"5. This agreement shall be in effect from and after the 31st day of October, 1935.

· · · · · · · · · · · · · ·

This agreement adopts the "Plan" of the State Public Welfare Board, which provides, among other things:

"1. From the sums appropriated therefore by the Legislative Assembly of the State of North Dakota, and from the sums granted to the State by the Federal Government for Social Welfare Activities, the Public Welfare Board of North Dakota will make direct grants to the several counties of the State which agree to participate in the State Plan herein outlined with such later modifications and amendments as may be found desirable.

"2. Grants made to the several counties of North Dakota will be made after taking into consideration amounts required to care for those in need of assistance, and after consideration of the financial ability or inability of each county to furnish such assistance without help from State or Federal Funds.

"3. The allocation of State Welfare Funds to the counties shall be specific grants to the County Welfare Boards by requisitions by the State Board upon the State Treasurer. Warrants shall be made payable to the County Treasurers to be deposited and kept in a fund separate and distinct from all other regular county and relief funds, such funds to be designated as the Social Welfare Fund.

"4. County expenditures will be matched from State and Federal funds only as to expenditures made for individual cases which have been investigated by the County Welfare Board and approved by said Board as entitled to assistance.

"5. Funds granted to counties by the Public Welfare Board shall be deposited by the county treasurer in a special fund which shall be designated 'Social Welfare Fund.'

"6. Disbursements from the Social Welfare Fund may be made only after authorization by the County Welfare Board. Relief payments shall be made in the form of relief orders issued by duly appointed representatives and employees of the County Welfare Boards. Bills covering relief orders with the relief orders properly endorsed attached thereto and bills covering other expenditures of the County Welfare Board shall be presented for payment to the County Welfare Boards which Boards shall at regular meetings audit such bills and present them to the County Auditor for payment. The County Auditor shall present the bills to the County Board of Commissioners for approval as in the case of all other county expenditures and when approved shall issue warrants against the 'Social Welfare Fund' or other county funds in payment of the bills.

"7. Provision shall be made for financial participation in Social Welfare expenditures, by the county government, in one of the two following ways:

"(a) By depositing in the Social Welfare Fund from time to time such sums as may be agreed upon between the Board of County Commissioners and the Public Welfare Board of North Dakota.

"(b) By payment from any county fund of such proportion of total Social Welfare expenditures in the county, as may be agreed upon between the Board of County Commissioners and the Public Welfare Board of North Dakota; provided that State and Federal funds shall be used to match county expenditures only in such individual cases as may be approved by the County Welfare Board as eligible for assistance under Federal statutes and rules or under State statutes, and rules which may be adopted from time to time by the Public Welfare Board of North Dakota.

"8. The Board of County Commissioners of each county shall match State and Federal grants on such basis as may be agreed upon between the Public Welfare Board of North Dakota and the individual Board of County Commissioners.

"9. The County Welfare Boards will be required to submit monthly reports on forms to be supplied by the State Welfare Board showing

all expenditures for relief purposes from both county funds and 'Social Welfare Funds,' such reports to show in detail every expenditure for relief purposes of whatever nature made in the county.

"10. The Public Welfare Board of North Dakota is authorized to spend Federal funds for the relief of destitution and for other social welfare purposes only in compliance with Federal regulations. Consequently, the state plan herein set forth may be modified from time to time to conform with the rules and regulations of the Federal Government.

. . . . . . . . . . . . . .

It is thus seen that there are two funds—the "County Poor Relief Fund," established by law, and this "Social Welfare Fund," set forth in the State Plan and made a part of the agreement between the Board of County Commissioners and the State Public Welfare Board.

Under the provisions of chapter 123 of the Session Laws of 1935, which amended § 25 of chapter 97 of the Session Laws of 1933, the power "to supervise and administer such relief and welfare activities in the county as may be financed in whole or in part by or with funds allocated or distributed by the Public Welfare Board of North Dakota" is lodged in the County Welfare Board. While the County Welfare Board has the power to "supervise and direct all relief and welfare activities conducted by the county," it has the power of supervision and administration of the relief and welfare activities which are financed by the state and Federal funds. The power to administer a fund is the power to dispense, to serve out the fund, to manage and distribute it.

While, as shown heretofore, the County Welfare Board of Stark county has no further power to make commitments against the County Poor Relief Fund, this does not prevent the County Welfare Board, in its administration of the state and Federal moneys, to employ workers and to have them paid from the funds furnished by the state and the Federal Government. The fact that a portion of these funds are deposited in the name of the county treasurer, to be withdrawn upon warrants issued by the county auditor, does not give the county control over those funds. It makes these officers merely administrative officers for the purpose of orderly procedure. The county commissioners can-

not forbid payment from such funds. The county commissioners have exclusive control over the County Poor Relief Fund only.

In Fluet v. McCabe, — Mass. —, 12 N. E. (2d) 89, 93, the distinctions between "supervise," "direct," and "administer" are pointed out. According to this authority, to administer and to manage are practically synonymous, and the terms "administer," "administrative," and "administration" are said to connote "management, as by managing or conducting, directing or superintending, the execution, application or conduct of persons or things."

When such power is lodged in the County Welfare Board by the statute of this state, to that extent it necessarily limits the power of the county commissioners in their exclusive control over relief work in their county.

Moneys allocated to a county from the state and Federal funds are paid to the county treasurer and deposited in the "Social Welfare Fund" of the county. Disbursements of this fund are not made unless authorized by the County Welfare Board. Bills covering the expenditures of the County Welfare Board, which necessarily include salaries and per diem paid to employees, are presented to the county welfare board for audit and approval. When so audited and approved, they are presented to the county auditor, whose duty it is to submit them to the Board of County Commissioners for its approval. When so approved, it is the duty of the auditor to issue his warrants on the "Social Welfare Fund," which warrants are to be paid by the county treasurer out of that fund.

Under the provisions of the State Plan agreed to by the Board of County Commissioners, it will be noted that the bills to be paid from the "Social Welfare Fund" are the relief orders "and bills covering other expenditures of the County Welfare Board," which bills must be audited by the County Welfare Board and presented to the county auditor, as before stated. The Board of County Commissioners has·no control over the administration of such moneys, except to see that claims are properly presented, audited, and allowed so as to co-ordinate relief work and to protect the county auditor and county treasurer.

It is true the "Plan" drafted by the Public Welfare Board makes provision for contributions to the "Social Welfare Fund" on the part of the county through the Board of County Commissioners; but when-

ever contributions are thus made and placed in the "Social Welfare Fund," they pass from the control of the county commissioners to those who have the control of the "Social Welfare Fund." They are not part of the "County Poor Relief Fund" as a distinct fund.

No statutory provision has been shown requiring the merger of the two funds—the "County Poor Relief Fund" and the "Social Welfare Fund." The former fund is under the direct control of the county commissioners. The moneys constituting that fund arise from the taxes paid by the people of the county. If this fund were kept separate and distinct from the "Social Welfare Fund," and if the demand were made that the salary be paid out of this fund, we would have additional questions for determination. As shown before, the "Social Welfare Fund" is formed from moneys allocated for relief work in the county by the State Public Welfare Board. This money does not become the money of the county. It does not constitute a gift to the county. The amount is fixed by the State Public Welfare Board after considering the needs, the needs of other parts of the state, the money on hand for distribution, and comparing the needs in Stark county with the needs in other parts of the state. It is true that as allocated the money is deposited with the county treasurer; but this does not make it county money in the sense that the moneys in the "County Poor Relief Fund" are county money. So long as the money sought to be charged by this claim is money allocated by the State Welfare Board, its administration is in the hands of the County Public Welfare Board without interference on the part of the county commissioners. The stipulated facts do not show whether the two funds have been merged; but if the county commissioners have transferred the moneys in the fund known as the "County Poor Relief Fund" to the "Public Welfare Fund," then the provisions of chapter 123 of the Session Laws of 1935, amending § 25 of chapter 97 of the Session Laws of 1933, would apply and the County Welfare Board has, under the direction and supervision of the Public Welfare Board, the power, and it is its duty, to supervise and administer such relief and welfare activities. in the county of Stark as are financed in whole or in part with funds allocated to Stark county for relief purposes by the State Public Welfare Board.

The stipulated facts show that there was money on deposit with the county treasurer in this "Social Welfare Fund" to pay this claim. The

control of this fund is in the hands of the County Public Welfare Board under the direction and supervision of the State Public Welfare Board. There is no claim that the State Public Welfare Board has in any way sought to interfere with the payment of this claim. While it is not directly stipulated, it is clear that the two boards are working in harmony, and there being money in the fund sufficient to pay the claim, and the claim being audited and ordered paid by the Public Welfare Board, the duties of the county auditor, of the Board of County Commissioners, and of the county treasurer became purely ministerial. While the members of the Board of County Commissioners are described as "the Board of County Commissioners," they are not disbursing county funds. The bill presented was, under the stipulation of facts, correct and proper in every particular. There is no claim whatever that it was not in harmony with the requirements of the Public Welfare Board, the County Welfare Board, and the "Plan" recognized by the county commissioners. Being admitted to be correct in all particulars, it became the duty of the county commissioners to give their approval so that the county auditor could draw his warrant against the "Social Welfare Fund" in order that it be paid by the county treasurer out of that fund.

. So long as the County Public Welfare Board is administering the "Social Welfare Fund" under the direction and supervision of the State Public Welfare Board, the county commissioners have no power or authority to interfere. They merely see that bills are properly made, audited, and allowed by the proper authorities. Such power could well have been lodged in other officers, but the state puts the duty on this Board.

The judgment of the lower court is reversed, and a writ of mandamus will issue as prayed for in the complaint.

NUESSLE, Ch. J., and CHRISTIANSON, MORRIS, and BURKE, JJ., concur.